UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                            :
LG CAPITAL FUNDING, LLC,                                    :
                                                            :
                              Plaintiff,                    :
                                                            :            17-cv-4006 (LJL)
           -v-                                              :
                                                            :            OPINION AND ORDER
EXELED HOLDINGS INC.,                                       :
                                                            :
                              Defendant.                    :
                                                            :
------------------------------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED: 03/13/2024

LEWIS J. LIMAN, United States District Judge:

     Counterclaim-Defendants LG Capital Funding, LLC ("LG Capital"), Joseph Lerman

("Lerman"), Boruch Greenberg ("Greenberg"), and Daniel Gellman ("Gellman" and collectively

with LG Capital, Lerman, and Greenberg, "Counterclaim-Defendants") move, pursuant to

Federal Rule of Civil Procedure 60(b), for an Order setting aside the Court's previous Order

permitting Counterclaim-Plaintiff ExeLED Holdings, Inc., formerly known as Energie Holdings,

Inc. ("ELED" or "Counterclaim-Plaintiff"), to assert its counterclaims, or alternatively, pursuant

to Federal Rule of Civil Procedure 12(b)(6), for an Order dismissing the counterclaims of

Counterclaim-Plaintiff for failure to state a claim upon which relief can be granted.  Dkt. No.

176.

     For the following reasons, the motion for relief from the Court's prior Order granting

ELED leave to assert counterclaims is denied, and the motion to dismiss for failure to state a

claim is granted in part and denied in part.

## BACKGROUND

     The facts of this case have been extensively described in the Court's prior opinions.  *See*

Dkt. Nos. 68, 107, 125, 167.  For the purposes of this motion, the Court accepts as true the well-

pleaded allegations of ELED's counterclaims, Dkt. No. 140 ("Counterclaim Complaint"),[1] along with the documents which are incorporated by reference or of which the Court may take judicial notice.  *See Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 382–83 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021) (summary order).  The Court recites here only the principal allegations of the dispute before it.

ELED is a Delaware corporation with a principal place of business in Colorado, and is publicly traded on the over-the-counter ("OTC") market.  Dkt. No. 140 ¶¶ 1–2.  LG Capital is a limited liability company based in Brooklyn, New York, that is in the business of making loans to other enterprises.  *Id.* ¶¶ 3, 13–14.

On August 19, 2015, ELED and LG Capital entered into two loan agreements, both in the form of convertible notes.  *Id.* ¶¶ 19, 20, 30.  The first agreement ("Note 1") provides for the loan of $58,937.26 by LG Capital to ELED, less a ten percent original issue discount ("OID") and subject to an eight percent annual interest rate.  *Id.* ¶ 20.  Note 1 was entered into pursuant to a securities purchase agreement executed by LG Capital and ELED on the same day ("Securities Purchase Agreement").  Dkt. No. 26 ¶¶ 6–7.  Under Note 1, LG Capital "could convert all or any amount of the debt owed under Note 1 into newly-issued shares of ELED common stock at a per share price equal to sixty-five percent of the *lowest* closing price during the 15 trading days prior to the conversion request."  Dkt. No. 140 ¶ 21 (emphasis in original).  Note 1 contains a choice-of-law provision, which states that the Note "shall be governed by and construed in accordance

---

[1] The Counterclaim Complaint includes ELED's Second Amended Answer to the First Amended Complaint, Dkt. No. 26, along with the statement of counterclaims.  The Counterclaim Complaint restarts the numbering of the paragraphs at the beginning of the statement of counterclaims on page eleven.  Unless otherwise noted, references in this Opinion and Order to numbered paragraphs of the Counterclaim Complaint refer to the paragraph numbers provided in the statement of counterclaims, and not to the paragraph numbers provided in the Second Amended Answer to the First Amended Complaint.

with the laws of New York applicable to contracts made and wholly to be performed within the State of New York and shall be binding upon the successors and assigns of each party hereto." *Id.* ¶ 23; Dkt. No. 140-1 § 14.  Pursuant to Note 1, LG Capital wire transferred $54,396.14 to ELED on August 19, 2015.  Dkt. No. 140 ¶ 29.  The second agreement ("Note 2," and together with Note 1, the "Notes") memorializes LG Capital's purchase of three separate loans made to ELED totaling $129,500, then owing to a company named KBM Worldwide, Inc., under which ELED was obligated to repay $129,746.30 plus interest accruing at a rate of eight percent per annum.  *Id.* ¶ 30.  Under Note 2, LG Capital "could convert all or any amount of the debt owed under Note [2] into newly-issued shares of ELED common stock at a per share price equal to 58% of the lowest closing price during the 15 trading days prior to the conversion request."  *Id.* ¶ 31.  Note 2 also contains the same choice-of-law provision as Note 1.  *Compare* Dkt. No. 140-2 § 14, *with* Dkt. No. 140-1 § 14.

Between September 30, 2015 and September 27, 2016, LG Capital exercised its option to convert the Notes from debt to shares of ELED common stock on twenty-five separate occasions, resulting in the cumulative collection by LG Capital of consideration with an estimated total value of $301,681.58 from ELED.  Dkt. No. 140 ¶¶ 45–46, 49.  The amount collected through LG Capital's exercise of conversion options exceeded the $183,896.14 lent to ELED by $117,785.44.  *Id.* ¶ 50.

On February 6, 2017, ELED and LG Capital entered into a redemption agreement ("Redemption Agreement"), pursuant to which the parties agreed that Note 1 had an outstanding balance of $12,700, and that Note 2 had an outstanding balance of $58,937.26.  *Id.* ¶ 39.  The Redemption Agreement increased the balance due on Note 1 by $2,300, establishing a new total balance due of $15,000 payable within one day of entry into the Redemption Agreement, and

increased the balance due on Note 2 by $16,062.74, establishing a new total balance due of $75,000 payable on or before March 3, 2017.  *Id.*  The Redemption Agreement thus foreclosed the possibility that LG Capital would convert any of the debt still owed into shares of ELED common stock in exchange for a higher cash repayment amount.  The Redemption Agreement also contains a choice-of-law provision, which stated that it "shall be governed by the laws of the State of New York."  Dkt. No. 140 ¶ 40; Dkt. No. 140-5 § 3(a).

Pursuant to the Redemption Agreement, ELED paid LG Capital a further $15,000, bringing the total amount collected by LG Capital to $316,681.58, or $132,785.44 more than was originally advanced to ELED under the Notes.  Dkt. No. 140 ¶¶ 52–53.

## PROCEDURAL HISTORY

This case has a long and complex history.  The Court describes only the most pertinent filings.

LG Capital initiated the action by filing a complaint in this Court against ELED on May 26, 2017, asserting claims for breach of the Securities Purchase Agreement, the Notes, and the Redemption Agreement, anticipatory breach of the Securities Purchase Agreement and the Notes, unjust enrichment, and for attorneys' fees and costs.  Dkt. No. 1.  On July 10, 2017, before ELED answered the complaint, LG Capital filed its First Amended Complaint ("FAC"). Dkt. No. 26.[2]  On July 19, 2017, ELED filed its Answer to the FAC asserting several affirmative defenses, along with a counterclaim for attorneys' fees and costs.  Dkt. No. 29.  As its Fourth Affirmative Defense to the FAC, ELED asserted that LG Capital's claims "are barred under New York law because the substance of the transactions at issue seek a criminally usurious rate of interest, requiring that Plaintiff's claims be dismissed."  *Id.* ¶ 104.  As its Fifth Affirmative

---

[2] LG Capital attempted to file the FAC on July 6, 2017, but it was rejected by the Clerk of Court as deficient.  Dkt. No. 25.

Defense to the FAC, ELED asserted that "[t]he claims are barred under New York law because the substance of the transactions at issue seek a criminally usurious rate of interest, requiring that Plaintiff's claims be reduced or adjusted as required by law." *Id.* ¶ 105.

LG Capital moved for summary judgment on its claims on February 9, 2018.  Dkt. No. 63.  On September 28, 2018, the Honorable Richard J. Sullivan, to whom the case was then assigned,[3] issued a Memorandum and Order granting in part and denying in part LG Capital's motion for summary judgment.  Dkt. No. 68.  Judge Sullivan granted LG Capital summary judgment on its claims for breach of the Securities Purchase Agreement and the Notes, but denied the motion for summary judgment on its claims for anticipatory breach and as to damages on all claims.  *Id.*

The Court scheduled a bench trial to begin on September 23, 2019.  *See* 9/17/19 Minute Entry.  On September 24, 2019, after ELED failed to appear for trial the previous day, Judge Rakoff granted default judgment in favor of LG Capital and referred the matter to the Honorable Ona T. Wang, United States Magistrate Judge, for an inquest on damages.  Dkt. No. 85.  On December 18, 2020, Judge Wang issued a Report and Recommendation on damages, Dkt. No. 105, but on October 25, 2021, this Court rejected the Report and Recommendation and calculated a different damages figure, Dkt. No. 107.  On November 22, 2021, the Court entered final judgment in favor of LG Capital in the total amount of $744,783.68.  Dkt. No. 114.

One month before the Court entered judgment, the New York Court of Appeals rendered its decision in *Adar Bays, LLC v. GeneSYS ID, Inc.*, 179 N.E.3d 612 (N.Y. 2021).  As further

---

[3] On October 17, 2018, Judge Sullivan received his commission to serve on the United States Court of Appeals for the Second Circuit.  *Sullivan, Richard Joseph*, FED. JUD. CTR., https://www.fjc.gov/node/1392581.  The case was reassigned to the Honorable Jed S. Rakoff on October 24, 2018, 10/24/18 Minute Entry, and to the undersigned on February 4, 2020, 2/4/20 Minute Entry.

discussed below, in *Adar Bays*, the Court of Appeals held that floating-price conversion option discounts constitute an interest expense that must be considered in usury analysis. *Id.* at 624 ("Because floating-price conversion options have intrinsic value that is bargained for in these loans, they should be treated as a component of interest.").

Relying on *Adar Bays*, ELED moved the Court to vacate the judgment on September 30, 2022 pursuant to Federal Rule of Civil Procedure 60(b)(1). Dkt. No. 117. The Court granted that motion on November 7, 2022, over LG Capital's objection. Dkt. No. 125. The Court concluded that Judge Sullivan's prior Order granting LG Capital summary judgment and, in turn, the final Judgment issued by this Court, rested on an error of law in light of *Adar Bays*. *Id.*

The Court held a case management conference on February 9, 2023, which was attended by counsel for LG Capital and ELED, *see* 2/9/23 Minute Entry, and on February 14, 2023, the Court entered a Case Management Plan and Scheduling Order, Dkt. No. 127. The Case Management Plan and Scheduling Order provided that any motion to amend or to join additional parties would be due no later than March 11, 2023. *Id.*

On March 10, 2023, ELED filed a motion for leave to file a Second Amended Answer, Affirmative Defenses and Counterclaims, along with an accompanying memorandum of law. Dkt. Nos. 128–29. On March 23, 2023, one day before the scheduled deadline for opposition papers, LG Capital filed a letter motion requesting a thirty-day extension of the deadline to oppose the motion to April 24, 2023. Dkt. No. 131. The Court granted that motion on March 27, 2023. Dkt. No. 133. However, LG Capital did not file any opposition by April 24, 2023, and on April 25, 2023, ELED filed a "Notice of Non-Opposition," alerting the Court that LG Capital had failed to timely respond to the motion to amend. Dkt. No. 134. On April 26, 2023, the Court granted ELED's motion to amend as unopposed. Dkt. No. 135.

ELED filed the Second Amended Answer, Affirmative Defenses and Counterclaims on May 10, 2023.  Dkt. No. 140.[4]  In addition to its responses to the FAC, ELED offered five affirmative defenses, asserted one counterclaim for violation of the Racketeer Influences and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), against all Counterclaim-Defendants, and asserted one counterclaim for RICO conspiracy, 18 U.S.C. § 1962(d), against only Lerman, Greenberg, and Gellman ("LG Managers").  *Id.*[5]

Counterclaim-Defendants filed this motion for the Court to set aside its Order granting Counterclaim-Plaintiff leave to amend, or alternatively, to dismiss Counterclaim-Plaintiff's counterclaims on July 11, 2023, along with a declaration and a memorandum of law in support of the motion.  Dkt. Nos. 176–78.  Counterclaim-Plaintiff filed a memorandum of law and declaration in opposition to the motion on July 28, 2023.  Dkt. Nos. 183–84.  Counterclaim-Defendants filed a reply in further support of their motion on August 7, 2023.  Dkt. No. 193.  On January 12, 2024, Counterclaim-Plaintiffs filed a notice of supplemental authority.  Dkt. No. 194.

## LEGAL STANDARD

Federal Rule of Civil Procedure 60(b) provides the standards and procedures for the court to relieve a party "from a final judgment, order, or proceeding."  Fed. R. Civ. P. 60(b).  The first subsection of Rule 60(b) states that a court may relieve a party due to "mistake, inadvertence, surprise, or excusable neglect . . . ."  Fed. R. Civ. P. 60(b)(1).  The Supreme Court outlined the test for "excusable neglect" in *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380 (1993).  This test looks to "(1) the danger of prejudice to the non-

---

[4] ELED originally attempted to file the Second Amended Answer and Counterclaims on April 26, 2023, but the filing was rejected by the Clerk of Court for a PDF error.  Dkt. No. 136.
[5] The Court extended the time for Counterclaim-Defendants to respond to the Counterclaim Complaint to July 11, 2023.  Dkt. No. 163.

movant, (2) the length of the delay and its potential impact on judicial proceedings, (3) the

reason for the delay, including whether it was within the reasonable control of the movant, and

(4) whether the movant acted in good faith." *Id.* at 395.

The final subsection of Rule 60(b) states that a court may also relieve a party from a final

judgment, order, or proceeding for "any other reason that justifies relief." Fed. R. Civ. P.

60(b)(6).  "'[I]f the reasons offered for relief from judgment can be considered in one of the

more specific clauses of Rule 60(b), such reasons will not justify relief under Rule 60(b)(6).'

This is true even where the relief sought pursuant to a more specific Rule 60(b) clause is denied."

*In re Pinnock*, 833 F. App'x 498, 502 (2d Cir. 2020) (summary order) (quoting *United States v.

Int'l Bhd. of Teamsters*, 247 F.3d 370, 391–92 (2d Cir. 2001)).  "Rule 60(b)(1) and Rule 60(b)(6)

are 'mutually exclusive,' such 'that any conduct which generally falls under the former cannot

stand as a ground for relief under the latter.'"  *Stevens v. Miller*, 676 F.3d 62, 67 (2d Cir. 2012)

(quoting *United States v. Cirami*, 535 F.2d 736, 740 (2d Cir. 1976)); *see also Kemp v. United

States*, 142 S. Ct. 1856, 1861 (2022) (Rule 60(b)(6) "is available only when Rules 60(b)(1)

through (b)(5) are inapplicable.").

"A motion to dismiss a counterclaim is evaluated under the same standard as a motion to

dismiss a complaint." *Town & Country Linen Corp. v. Ingenious Designs LLC*, 2020 WL

3472597, at *4 (S.D.N.Y. June 25, 2020) (citing *Orientview Techs. LLC v. Seven For All

Mankind, LLC*, 2013 WL 4016302, at *2 (S.D.N.Y. Aug. 7, 2013)).  To survive a motion to

dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon

which relief can be granted, a complaint must include "sufficient factual matter, accepted as true,

to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint must

8

offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 555, 557. The ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011). When adjudicating a motion to dismiss under Rule 12(b)(6), the court considers not only the well-pleaded allegations of the complaint but documents incorporated by reference and "matters of which judicial notice may be taken." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *see Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d at 382–83.

## DISCUSSION

## I.   Counterclaim-Defendants' Motion for Relief Pursuant to Rule 60(b)

As the Court has previously had opportunity to remind the parties, "[b]y its own terms, Rule 60(b) applies only to judgments that are final." Dkt. No. 125 at 8–9 (quoting *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 99 F.3d 538, 541 (2d Cir. 1996)); *see also* Fed. R. Civ. P. 60(b), Advisory Committee Notes 1946 Amendment ("The addition of the qualifying word 'final' emphasizes the character of the judgments, orders or proceedings from which Rule 60(b) affords relief, and hence interlocutory orders are not brought within the restrictions of the rule, but rather they are left subject to the complete power of the court rendering them to afford relief from them as justice requires."). "A final judgment or order is one that conclusively determines

all pending claims of all the parties to the litigation, leaving nothing for the court to do but execute its decision." *Petrello v. White*, 533 F.3d 110, 113 (2d Cir. 2008).

The Court possesses inherent equitable powers to reconsider interlocutory orders before judgment is entered. *See* Fed. R. Civ. P. 60(b), Advisory Committee Notes 1946 Amendment ("[I]nterlocutory orders are . . . left subject to the complete power of the court rendering them to afford relief from them as justice requires."); *United States v. LoRusso*, 695 F.2d 45, 53 (2d Cir. 1982) ("A district court has the inherent power to reconsider and modify its interlocutory orders prior to the entry of judgment, whether they be oral, or written, and there is no provision in the rules or any statute that is inconsistent with this power." (internal citations omitted)); *United States v. Jerry*, 487 F.2d 600, 605 (3d Cir. 1973), *abrogated on other grounds by Ohio v. Johnson*, 467 U.S. 493, 500 n.9 (1984) ("[S]o long as the district court has jurisdiction over the case, it possesses inherent power over interlocutory orders, and can reconsider them when it is consonant with justice to do so."); *see also Stern v. Highland Lake Homeowners*, 2021 WL 1164718, at *5 (S.D.N.Y. Mar. 26, 2021) ("Despite the finding that the Defendant's motion is procedurally deficient insofar as it seeks relief under Rule 60(b), the Court possesses inherent equitable powers to reconsider and modify its interlocutory orders prior to entry of judgment.").

Counterclaim-Defendants' request for relief is framed as a request for relief from the Court's Order permitting ELED to assert its counterclaims, Dkt. No. 135, but in making such request, Counterclaim-Defendants reference their default in responding to the motion for leave to assert counterclaims, *see* Dkt. No. 178 at 4. The Court had granted Counterclaim-Defendants' request for an extension to file its opposition to ELED's motion for leave to assert its counterclaim, Dkt. No. 131, and, as requested by Counterclaim-Defendants, imposed a deadline of April 24, 2023 for the Counterclaim-Defendants to oppose ELED's motion for leave to assert

10

counterclaims, Dkt. No. 133.  After Counterclaim-Defendants did not submit opposition to ELED's motion by the April 24, 2023 deadline, Dkt. No. 134, the Court granted ELED's motion as unopposed on April 26, 2023, Dkt. No. 135.  If relevant at all, Counterclaim-Defendants' "excusable neglect" in failing to submit opposition to ELED's motion would be possible grounds for relief from the Court's Order imposing the April 24, 2023 deadline for a response, rather than grounds for relief from the Court's Order granting ELED leave to assert counterclaims; accordingly, the relief that this Court would grant would be to vacate its Order granting leave to file the Counterclaim Complaint and to permit argument on the motion, and not, as Counterclaim-Defendants request, an Order outright denying ELED's motion.  *See* Dkt. No. 178 at 4.  But in any case, neither Order by the Court conclusively determines all pending claims of all the parties to the litigation, and thus, neither Order falls within the purview of Federal Rule of Civil Procedure 60(b).

The Court declines to exercise its inherent equitable power to reconsider its grant of leave to file the Counterclaim Complaint.  Counterclaim-Defendants were granted a thirty-one-day extension to file their response to ELED's motion for leave to file the Counterclaim Complaint. *See* Dkt. No. 133.  The medical emergency that counsel for Counterclaim-Defendants now references as justifying equitable reconsideration of the Court's Order granting leave to file the Counterclaim-Complaint occurred only two days before the deadline for a response, and more than six weeks after the motion for leave was made.  *See* Dkt. No. 177 ¶ 11.  Counsel for Counterclaim-Defendants was aware of their desire for relief from the Court's Order at least as early as May 2, 2023, when they contacted counsel for ELED to inquire whether they would consent to the Court vacating the Order.  *Id.* ¶ 12.  Yet Counterclaim-Defendants did not request relief until it filed its motion to dismiss more than two months later, on July 11, 2023.  *See* Dkt.

No. 176.  Counterclaim-Defendants provide no explanation for their delay in making the Court aware of the medical emergency and the need for relief.  The Court therefore does not find that justice requires it vacate its Order granting the motion for leave to file the Counterclaim Complaint.

## II.   Counterclaim-Defendants' Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)

Counterclaim-Defendants move in the alternative, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the counterclaims because they: (i) are time-barred by RICO's statute of limitations, *see* Dkt. No. 178 at 5–9; and (ii) fail to state a claim upon which relief can be granted, *id.* at 9–20.

### A.   Statute of Limitations

"Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint."  *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 798 n.12 (2d Cir. 2014) (citation omitted); *see also Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989) ("Where the dates in a complaint show that an action is barred by a statute of limitations, a defendant may raise the affirmative defense in a pre-answer motion to dismiss.").  "Because the statute of limitations is an affirmative defense, the defendant bears the burden of establishing by prima facie proof that the limitations period has expired since the plaintiff's claims accrued."  *Overall v. Estate of Klotz*, 52 F.3d 398, 403 (2d Cir. 1995); *see also Gonzalez v. Hasty*, 651 F.3d 318, 322 (2d Cir. 2011) ("[T]he burden is on the defendant to establish when a federal claim accrues.").  If it appears from the face of a complaint that the claims are *prima facie* time-barred, the burden is on the plaintiff to "plausibly alleg[e] that they fall within an exception to the applicable statute of limitations."  *Twersky v. Yeshiva Univ.*, 993

F. Supp. 2d 429, 436 (S.D.N.Y. 2014), *aff'd*, 579 F. App'x 7 (2d Cir. 2014) (summary order) (citing cases).

RICO claims are governed by a four-year statute of limitations which "begins to run when the plaintiff discovers or should have discovered the RICO injury," such that the plaintiff has "actual or inquiry notice of the injury." *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 58, 60 (2d Cir. 1998). A plaintiff need not have known of the cause of action for the limitations period to begin; instead, the four-year period begins upon "discovery of the injury, not discovery of the other elements of the claim." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 148 (2d Cir. 2012) (quoting *Rotella v. Wood*, 528 U.S. 549, 555 (2000)). Accordingly, "[t]he first step in the statute of limitations analysis is to determine when the [parties] sustained the alleged injury for which they seek redress." *Merrill Lynch*, 154 F.3d at 59. The Court "then determine[s] when they discovered or should have discovered the injury and begin[s] the four-year statute of limitations period at that point." *Id.*

Federal Rule of Civil Procedure 15(c) provides the circumstances in which "an amendment to a pleading relates back to the date of the original pleading . . . ." Fed. R. Civ. P. 15(c). Broadly, "Rule 15(c) is based on the notion that once litigation involving particular conduct or a given transaction or occurrence has been instituted, the parties are not entitled to the protection of the statute of limitations against the later assertion by amendment of defenses or claims that arise out of the same conduct, transaction, or occurrence as set forth in the original pleading." 18B C. Wright & A. Miller, Fed. Prac. & Proc. § 1496 (2d ed. 2020). One circumstance in which the amendment is deemed to relate back to the original pleading is when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading[.]" Fed. R. Civ. P.

15(c)(1)(B).  "In determining whether the claim arises out of the same conduct or occurrence, '[t]he pertinent inquiry . . . is whether the original complaint gave the defendant fair notice of the newly alleged claims.'"  *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 815 (2d Cir. 2000) (quoting *Wilson v. Fairchild Republic Co.*, 143 F.3d 733 738 (2d Cir. 1998)) (citations and internal quotation marks omitted).

Federal Rule of Civil Procedure 15(c)(1)(C), meanwhile, governs whether an amendment that changes the party against whom a claim is asserted is deemed to relate back to the original pleading.  *See Berman v. Perez*, 2018 WL 565269, at *3 n.3 (S.D.N.Y. Jan. 24, 2018) ("Rule 15(c)(1)(B), which provides that an amended pleading relates back when 'the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading,' does not apply here because Berman seeks to add a new party which is covered by Rule 15(c)(1)(C), which adds additional requirements to those contained in Rule 15(c)(1)(B)." (quoting Fed. R. Civ. P. 15(c)(1)(B)).  That rule provides that an amendment relates back to the original pleading when:

> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>
> > (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
> >
> > (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1)(C); *see also VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 128 (2d Cir. 2001) ("If a complaint is amended to include an additional defendant after the statute of limitations has run, the amended complaint is not time barred if it 'relates back' to a timely filed complaint."); *Abdell v. City of New York*, 759 F. Supp. 2d 450, 454 (S.D.N.Y. 2010) (citing

same).  Courts applying Rule 15(c)(1)(C) have held it to be satisfied where the following
conditions are met: "(1) the claim must have arisen out of conduct set out in the original
pleading; (2) the party to be brought in must have received such notice that it will not be
prejudiced in maintaining its defense; (3) that party should have known that, but for a mistake of
identity, the original action would have been brought against it; and . . . [(4)] the second and third
criteria are fulfilled within 120 days of the filing of the original complaint, and . . . the original
complaint [was] filed within the limitations period."  *Barrow v. Wethersfield Police Dep't*, 66
F.3d 466, 468–69 (2d Cir. 1995).

ELED invokes Rule 15 to assert that its newly alleged counterclaims relate back to its
original Answer, filed July 19, 2017.  *See* Dkt. No. 29.  That Answer brought only a single
counterclaim for attorneys' fees and costs, not supported by any affirmative factual allegations,
pursuant to a provision of the Securities Purchase Agreement, which stated that in the event of
litigation, "[t]he prevailing party shall be entitled to recover from the other party its reasonable
attorney's fees and costs."  *Id.* ¶ 116 (quoting Dkt. No. 26-1 § 5(a)).  While Rule 15 is typically
invoked to amend a pleading by adding new claims, the Rule also permits an omitted
counterclaim to relate back when it arises from the same conduct, transaction, or occurrence
alleged in the original pleading.  *See In re Zhejiang Photovoltaic Co., Ltd.*, 651 B.R. 477, 492
(Bankr. D.N.J. 2023) ("[A]n omitted counterclaim can relate back to the filing of an answer.");
*Korean Air Lines Co., Ltd. v. Port Auth. of N.Y. & N.J.*, 2012 WL 6967232, at *5 (E.D.N.Y.
Aug. 1, 2012); *In re Olympia Brewing Co. Sec. Litig.*, 1985 WL 8803, at *6 (N.D. Ill. Jan. 14,
1985); *Banco Para El Comercio Exterior De Cuba v. First Nat'l City Bank*, 744 F.2d 237, 243
(2d Cir. 1984); *see also* 18B C. Wright & A. Miller, Fed. Prac. & Proc. § 1496.1 (2d ed. 2020)
("It is somewhat inconsistent to conclude that after the limitations period has run plaintiff may

allege an additional claim for relief arising from the conduct, transaction, or occurrence involved in the original claim and that it will relate back under Rule 15(c), yet deny defendant an analogous opportunity by deciding that a compulsory counterclaim will not relate back unless, in a diversity case, state law would permit it to do so . . . . Whatever confusion existed about the applicability of Rule 15(c) to omitted counterclaims was ended by the 2009 amendments to the rules.  The amendments eliminated Rule 13(f) on the grounds that it was redundant and that Rule 15 should control all pleading amendments, whether they embrace omitted counterclaims or other matters.").  Rule 15(c) therefore does apply to the determination of whether the counterclaims asserted in the Counterclaim Complaint relate back to the Answer.

Counterclaim-Defendants assert that ELED's claims, alleging violations of RICO, are time-barred.  Dkt. No. 178 at 5–9.  Counterclaim-Defendants first cite the four-year statute of limitations for civil RICO claims established by the Supreme Court in *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987), as well as the separate accrual rule of this Circuit, under which a new cause of action arises each time a plaintiff discovers or should have discovered an injury caused by a violation of RICO, Dkt. No. 178 at 5 (citing *Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1105 (2d Cir. 1988), *cert. denied*, 490 U.S. 1007 (1989)). Counterclaim-Defendants further argue that under Federal Rule of Civil Procedure 15, the counterclaims do not relate back to ELED's original Answer to the First Amended Complaint because the original Answer did not include RICO counterclaims, and because ELED added three individual defendants to its Counterclaim Complaint.  *Id.* at 5–6.  Counterclaim-Defendants argue that the statute of limitations for ELED's RICO counterclaims therefore began running on February 6, 2017, the date of the latest-in-time allegedly unlawful debt-collection included in the Counterclaim Complaint, which is more than four-years prior to Counterclaim-Defendants'

16

waiver of service of the Counterclaim Complaint on May 12, 2023, thereby requiring the Court to dismiss the counterclaims as time-barred.  *Id.* at 8–9.

ELED responds, as an initial matter, that Counterclaim-Defendants waived the argument that the counterclaims are time-barred because they failed to raise it in opposition to ELED's motion for leave to amend.  Dkt. No. 184 at 7 ("[T]he time for the LG Parties to properly raise any such Rule 15(c) arguments would have been *in their opposition to ELED's motion for leave to amend*.  The LG Parties, however, failed to timely file opposition before the April 24, 2023 deadline, despite being afforded more than a month to do so." (emphasis in original)).  On the merits of the timeliness argument, ELED responds that its counterclaims are timely because they relate back to ELED's Answer, filed on July 19, 2017—well less than four-years after February 6, 2017 debt collection and therefore safely within the statute of limitations for RICO claims.  *Id.* at 8–10.  ELED argues that its counterclaims satisfy Federal Rule of Civil Procedure 15(c)(1)(b)—which requires that the original complaint gave the defendant fair notice of the newly alleged claims—and that relation back to the Answer is mandated.  *Id.* at 10 & n.9.  According to ELED, its Answer "indisputably alleged that the Notes are criminally usurious loans that charge interest rates in violation of New York's usury laws," and that its RICO claims therefore "arise from conduct raised in the Answer that LG—and, by extension, the LG Managers—have had notice of since July 19, 2017."  *Id.* at 10–11.  ELED also disputes Counterclaim-Defendants' contention that the addition of the LG Managers as defendants prohibits relation back to the Answer, arguing that the defendants added here had actual notice of the action as managers of the original counterclaim-defendant, and that it lacked knowledge of the LG Managers' liability at the time of filing the Answer.  *Id.* at 12–13.

As a threshold matter, the Court notes that Counterclaim-Defendants assert, and ELED does not dispute, that the statute of limitations began to run on February 6, 2017, the day on which the final allegedly unlawful collection took place. *See* Dkt. No. 140 ¶ 105; Dkt. No. 178 at 9; Dkt. No. 184 at 8–11; *see also Yien-Koo King v. Wang*, 2020 WL 6875403, at *15 (S.D.N.Y. Nov. 23, 2020) ("RICO claims are governed by a four-year statute of limitations which 'begins to run when the plaintiff discovers or should have discovered the RICO injury,' such that the plaintiff has 'actual or inquiry notice of the injury.'" (quoting *Merrill Lynch*, 154 F.3d at 58, 60)). The parties also do not dispute that the applicable statute of limitations is four years, that ELED's initial Answer was filed within the statute of limitations, and that ELED's Counterclaim Complaint was served upon all Defendants after the statute of limitations expired. Thus, the only disputes before the Court are whether the counterclaims asserts in ELED's Counterclaim Complaint relate back to ELED's Answer, and whether Counterclaim-Defendants waived any argument that they do not.

### 1. Waiver

The Counterclaim-Defendants did not waive their argument with respect to the timeliness of the counterclaims by failing to oppose the motion for leave to file the counterclaims. In its memorandum of law in support of the motion for leave to file the Counterclaim Complaint, ELED did affirmatively argue that the counterclaims related back to the Answer pursuant to Federal Rule of Civil Procedure 15(c), and were therefore timely. *See* Dkt. No. 129 at 16–18. And, under Federal Rule of Civil Procedure 8(c), "time bars generally must be raised in an answer or responsive pleading." *Kontrick v. Ryan*, 540 U.S. 443, 458–59 (2004); *see* Fed. R. Civ. P. 8(c) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including: . . . statute of limitations[.]").

The effect of Counterclaim-Defendants' failure to respond to the motion for leave to file the counterclaims is that Counterclaim-Defendants waived their rights to argue that the amendment should not be permitted on Rule 15(a) grounds of undue delay, bad faith, or undue prejudice.  *See Quaratino v. Tiffany & Co.*, 71 F.3d 58, 66 (2d Cir. 1995) (court may deny amendment for "undue delay, bad faith, dilatory tactics, undue prejudice to the party to be served with the proposed pleading, or futility").  However, Counterclaim-Defendants did not forego their right to challenge the timeliness of the RICO counterclaims.  Federal Rule of Civil Procedure 7(a) defines "pleadings" to include "a complaint, [an] answer, [an] answer to a counterclaim or cross-claim, [a] third party complaint, [an] answer to a third-party complaint, and [a] reply to an answer." *Chavarria v. Hamlet*, 2010 WL 1461040, *3 (N.D. Cal. Apr. 12, 2010) (citing Fed R. Civ. P. 7(a)).  ELED's motion for leave to file its Counterclaim Complaint thus does not constitute a pleading such that Counterclaim-Defendants were required to respond with an affirmative statement of all affirmative defenses, else those affirmative defenses would be waived.  Counterclaim-Defendants ultimately asserted that the counterclaims were time-barred in the instant motion to dismiss—which Counterclaim-Defendants filed in response to the Counterclaim Complaint, before their answer to the Counterclaim Complaint—thereby satisfying the requirements of Rule 8(c).  *See Lilly v. District of Columbia*, 657 F. Supp. 3d 65, 86 (D.D.C. 2023) ("[T]he statute of limitations, waiver, and other time-related defenses are considered 'affirmative defenses' under Rule 8(c), which must be affirmatively raised in a responsive pleading and not in a Rule 12 motion.").  Counterclaim-Defendants therefore did not waive their timeliness defense.  *See In re Stewart*, 2022 WL 790415, at *12 (Bankr. W.D. Okla. Mar. 14, 2022) (finding no waiver of objection to timeliness based upon failure to respond to motion for

leave to amend); *Chavarria*, 2010 WL 1461040, at *3 (holding party did not waive its statute of limitations defense by filing a notice of non-opposition to other party's motion to amend).

2. **Counterclaim Against LG Capital**

The counterclaim brought against LG Capital relates back to the date of the Answer, and is thus timely as to that Counterclaim-Defendant.  LG Capital is the sole plaintiff in this action, and filed the First Amended Complaint as such on July 10, 2017.  The Answer to the First Amended Complaint, filed on July 19, 2017 and thus filed well within the statute of limitations for the RICO counterclaims, contained two affirmative defenses asserting that Counterclaim-Defendants' claims "are barred under New York law because the substance of the transactions at issue seek a criminally usurious rate of interest."  Dkt. No. 29 ¶¶ 104–05.  The Counterclaim Complaint, meanwhile, asserts two causes of action under RICO, but only one cause of action against LG Capital.  *See* Dkt. No. 140 ¶¶ 90–117.  The first cause of action, brought against all Counterclaim-Defendants, alleges that LG Capital, at the direction of LG Managers, conducted an unlawful, usurious debt-collection scheme because the interest rate charged on the Notes was more than double the maximum interest rate permitted under New York law.  *Id.* ¶¶ 90–109.

Because LG Capital is both the plaintiff in the First Amended Complaint and a Counterclaim-Defendant to the first cause of action of the Counterclaim Complaint, Rule 15(c)(1)(B) governs whether the first counterclaim relates back to the Answer and is thus timely.  The relevant question is whether the counterclaim arises out of the same conduct, transaction, or occurrence as that alleged in the Answer, thereby putting LG Capital on notice of the possibility of the counterclaim.  Fed. R. Civ. P. 15(c)(1)(B).  The Court finds that it does.  The central transactions at issue in the FAC and in the Answer to that pleading were those reflected in the Securities Purchase Agreement, the Notes, and the Redemption Agreement.  In the FAC, Dkt. No. 26, LG Capital asserted claims against ELED for breach of the Securities Purchase

20

Agreement, *id.* ¶¶ 71–76, breach of Note 1, *id.* ¶¶ 77–82, unjust enrichment for failure to make restitution for the funds loaned to it under the Securities Purchase Agreement and Note 1, *id.* ¶¶ 83–86, anticipatory breach of both of the Notes and the Securities Purchase Agreement, *id.* ¶¶ 87–92, and breach of the Redemption Agreement, *id.* ¶¶ 93–97.  LG Capital asserted that ELED breached its obligations under those instruments by failing to honor LG Capital's request for conversion, and failing to make a $75,000 payment in relation to Note 1.  *Id.* ¶¶ 26, 31, 35, 37–39, 42–43, 49, 55.  ELED defended against those claims on the grounds that the Notes asserted a usurious rate of interest.  In its Answer to the First Amended Complaint, ELED asserted two affirmative defenses, which each sought to absolve ELED of liability because "the substance of the transactions at issue seek a criminally usurious rate of interest, requiring that Plaintiff's claims be dismissed."  Dkt. No. 29 ¶¶ 105–06.  The Answer therefore put LG Capital on notice of ELED's assertion that the transactions at issue in the First Amended Complaint—the Securities Purchase Agreement, the Notes, and the Redemption Agreement—were unlawful because the interest rates charged under them constituted usury.

The counterclaim against LG Capital arises out of the same transactions and is premised on the identical allegation that the rate of interest implied by the Notes is usurious.  It alleges that "[t]hrough the Notes, [LG Capital] charged, took, and received interest from ELED at rates in excess of 50% A.P.R., or more than twice the maximum enforceable rate of interest permitted by New York's usury laws."  Dkt. No. 140 ¶ 95.  ELED continues, "the Counterclaim-Defendants charged an unlawful debt onto ELED through the Notes, pursuant to which they collected $316,681.58 worth of consideration from ELED," causing ELED to "suffer[] out-of-pocket losses of $132,785.44, calculated by deducting the $183,896.14 that was advanced under the Notes from the $316,681.58 of consideration [LG Capital] collected through the Notes and

Redemption Agreement." *Id.* ¶¶ 103–04.  The counterclaim asserts that ELED's unlawful debt collection consists of the "25 separate collections" made on the Notes between September 30, 2015 and September 27, 2016 and a single debt collection of $15,000 on or about February 6, 2017, *id.* ¶ 105, identical to the collections from September 2015 to September 2016 alleged in the FAC that ELED claimed were criminally usurious, *see* Dkt. No. 26 ¶ 21.  ELED alleges that the RICO injuries it suffered consisted of "the remittance of valuable consideration—newly issued shares of ELED stock—in excess of the amounts that were actually loaned to ELED through loan transactions that are (i) void in whole because of New York's usury laws, and (ii) charge an interest rate that is at least twice the maximum lawful rate of interest allowed by New York's usury laws."  Dkt. No. 140 ¶ 106.  The thrust of the counterclaims is thus that the Notes and the Redemption Agreement charged ELED an unlawful interest rate—the same assertion underlying the affirmative defenses in the Answer.  LG Capital therefore had notice not only that ELED believed the interest rate charged on the Notes to be usurious, but further, that ELED believed the interest rate charged was unlawful, and that ELED was going to take discovery on the issue and be prepared to try it.

To be sure, the RICO counterclaim against LG Capital seeks relief different from that sought in the Answer, and contains additional detail from that contained in the Answer.  Neither is fatal to ELED's relation-back argument.  Relation-back under Rule 15(c)(1)(B) turns on whether the newly asserted claim arises out of the transaction or occurrence alleged in the earlier pleading, and not on whether the defendant to the newly asserted claim had notice of the particular claim being asserted or relief being requested.  If the newly asserted claim is based on the earlier alleged transaction or occurrence, the adverse party can be deemed to have notice. *See, e.g.*, *Wilson v. Fairchild Republic Co., Inc.*, 143 F.3d 733, 738 (2d Cir. 1998), *overruled on*

*other grounds by Slayton v. Am. Express Co.*, 460 F.3d 215 (2d Cir. 2006) (noting that "[i]n order for a claim to relate back, it must arise out of the same 'conduct, transaction, or occurrence' as the claims raised in the earlier filing," and stating that "[t]he pertinent inquiry, in [that] respect, is whether the original complaint gave the defendant fair notice of the newly alleged claims").  As discussed further below, Rule 15(c)(1)(C), which applies when the amendment seeks to add a new party, requires notice and the absence of prejudice.  By contrast, where an amendment has been permitted under Rule 15(a) and where it does not seek to add new parties, there is no separate and independent requirement of notice of the specific claim. "The rationale of Rule 15(c) is that a party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide." *Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 150 n.3 (1984).

The Second Circuit has instructed that if an original complaint refers to two acts of fraud, but does not contain a RICO claim, a RICO count based on a pattern of racketeering that involved those two frauds would relate back.  *See Tho Dinh Tran v. Alphonse Hotel Corp.*, 281 F.3d 23, 36 (2d Cir. 2002), *overruled on other grounds by Slayton*, 460 F.3d 215 ("If the original complaint referred to general acts of fraud or other predicate acts that might support a RICO claim, then a later amendment adding a RICO claim would 'relate back' to the original complaint.  Even if the description of such an act of fraud was not fully developed or specifically described as part of a RICO conspiracy, it would put the defendants on notice that the conduct was at issue." (internal citation omitted)).  It would be irrelevant that the newly-asserted claim seeks relief—in the form of treble damages—that is dramatically different from and greater than that requested in the original complaint.  A claim as to which punitive damages attaches may, for example, relate back to a claim on which the pleader seeks simple benefit-of-the-bargain

damages.  *See, e.g.*, *Padilla v. Sears, Roebuck & Co.*, 2012 WL 5505071, at *2–3 (N.D. Cal.

Nov. 13, 2012); *Estate of Grier ex rel. Grier v. Univ. of Pa. Health Sys.*, 2009 WL 1652168, at

*9 (E.D. Pa. June 11, 2009); *Schieszler v. Ferrum Coll.*, 233 F. Supp. 2d 796, 806–07 (W.D. Va.

2002).  The same logic applies with respect to ELED's counterclaim for a RICO violation based

on LG Capital's allegedly usurious loans.  Although the RICO counterclaim seeks relief different

from that in the answer—treble damages as opposed to relief from the need further to satisfy the

Notes—the difference is immaterial.  The Rule 15(c)(1)(B) analysis looks to whether the later

claim and the earlier pleading all relate to the same transaction.  Here, they manifestly do, as

there is no distinction between the transactions at issue in the Answer and the transactions at

issue in the Counterclaim Complaint.  The first counterclaim, as against LG Capital, is thus a

"natural offshoot" of the allegations in the original pleading.  *See Slayton*, 460 F.3d at 228.

   Nor is ELED's relation-back argument defeated by the fact that the Counterclaim

Complaint contains additional allegations not contained in the Answer.  The Counterclaim

Complaint does refer to LG Capital's business model of making usurious loans, Dkt. No. 140

¶¶ 13–18, and contains allegations regarding similar, unlawful loans that LG Capital made to

other entities, *id.* ¶¶ 58–64.  However, the New York Court of Appeals has held that one relevant

question in determining whether a loan containing a floating price conversion feature is usurious

is "the prior performance of similarly structured floating-price convertible loans made by a

lender."  *Adar Bays*, 179 N.E.3d at 626.  The other notes alleged in the counterclaim were thus

central to the defense of criminal usury asserted in the Answer.  And the Second Circuit has held

that the theory of liability need not be "fully developed or specifically described as part of a

RICO conspiracy" to put the adverse party "on notice that the conduct was at issue."  *Tho Dinh*

*Tran*, 281 F.3d at 36.  Here, the RICO counterclaim is based on "[LG Capital's] business model

as applied to ELED."  Dkt. No. 140 ¶¶ 19–53.  Although it spells out certain of the other

similarly structured loans or the business model that implicit in the Answer, the affirmative

defenses and the counterclaim against LG Capital still arise from identical transactions.

### 3.     Counterclaims Against LG Managers

The Answer did not, however, satisfy Rule 15(c)(1)(C) and put the LG Managers on

notice that they may be subject to individual liability for counterclaims under RICO.  It is

undisputed that the LG Managers were not parties to the original action.  *See* Dkt. No. 26.  Thus,

the counterclaims against the LG Managers must satisfy not only the requirements of Rule

15(c)(1)(B), but also the more stringent requirements of Rule 15(c)(1)(C).  *See Lewis v. City of

New York*, 2019 WL 2766503, at *3 n.2 (S.D.N.Y. July 2, 2019) ("Rule 15(c)(1)(B), which

provides that an amended pleading relates back when 'the amendment asserts a claim or defense

that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in

the original pleading,' does not apply here because the plaintiff seeks to add a new party which is

covered by Rule 15(c)(1)(C), which adds additional requirements to those contained in Rule

15(c)(1)(B)."); *Hahn v. Off. & Pro. Emps. Int'l Union*, 107 F. Supp. 3d 379, 384 (S.D.N.Y.

2015) ("Additionally, Rule 15(c)(1)(B) is applicable only in the sense that it is incorporated into

Rule 15(c)(1)(C), which is the proper rule under which the Court makes a relation-back

determination for an amendment that changes or adds parties.").

Under Rule 15(c)(1)(C), ELED must show both that, during the 90-day period following

the filing of the Answer, the LG Managers "received such notice of the action that [they] will not

be prejudiced in defending on the merits" and that the LG Managers "knew or should have

known that the action would have been brought against [them], but for a mistake concerning the

proper party's identity."  Fed. R. Civ. P. 15(c)(1)(C).  The relevant question under Rule

15(c)(1)(C)(ii) is whether the newly named defendants "knew or should have known during the

Rule 4(m) period" that they would have been named as a defendant but for some error.  *See Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 548 (2010); *see also id.* at 549 ("The only question under Rule 15(c)(1)(C)(ii), then, is whether party A knew or should have known that, absent some mistake, the action would have been brought against him.").

ELED argues that the LG Managers "knew or should have known that they would have been sued but for the mistake of law made by countless courts misinterpreting New York usury law, which in turn caused ELED's mistake as to the identities to the liable parties."  Dkt. No. 184 at 2.  Prior to the New York Court of Appeals decision in *Adar Bays*, a handful of judges in this District had held that the implied rate of interest from a floating-price conversion was "too uncertain to incorporate into an interest rate calculation."  *Union Cap. LLC v. Vape Holdings Inc.*, 2017 WL 1406278, at *5 (S.D.N.Y. Mar. 31, 2017); *see also EMA Fin., LLC v. Joey N.Y., Inc.*, 2019 WL 4600863, at *5 (S.D.N.Y. Sept. 22, 2019) ("Defendants fail to explain why this central holding from *Union Capital* should not apply here.  Here, as in *Union Capital*, Plaintiff merely held an option to convert shares at a discount.  Because Plaintiff could have elected to obtain repayment of the principal in cash at an interest rate that Defendants do not assert would exceed twenty-five percent, the Agreements were not usurious on their face, and Defendants' argument that they are unenforceable fails."); *LG Cap. Funding, LLC v. Aim Expl., Inc.*, 2018 WL 4119149, at *4 (S.D.N.Y. Aug. 29, 2018) ("[A]ccording to Defendant, the Court must include the 45% discount rate in its interest computations.  Defendant's argument fails the Motion to Dismiss stage."); *Phlo Corp. v. Stevens*, 2001 WL 1313387, at *5 (S.D.N.Y. Oct. 25, 2001) ("[I]t was not clear that any effective interest rate in excess of 25% would ever have to be paid, as the value of the warrants was uncertain.").  Those opinions were in error.  This Court shared that erroneous opinion.  Dkt. No. 68 at 6; *LG Cap. Funding, LLC v. ExeLED Holdings,*

*Inc.*, 2018 WL 6547160, at \*5 (S.D.N.Y. Sept. 28, 2018).  The Second Circuit did not hold the same mistaken view.  *Adar Bays, LLC v. GeneSYS ID, Inc.*, 962 F.3d 86, 94 (2d Cir. 2020).  It certified the question to the New York Court of Appeals, which held in *Adar Bays* that "the value of floating-price options, measured at the time of the agreement, should be included when determining the rate of interest for purposes of usury statutes, to the extent such valuation can be proven by reasonable methods."  179 N.E.3d at 627.

ELED has not established the existence of a mistake "concerning the proper party's identity" of the type that the LG Managers knew or should have known that they would have been named but for the error.  *Krupski*, 560 U.S. at 548.  In the first instance, the view that the floating-price conversion feature of the Notes was not properly included as part of the interest would have applied equally to the affirmative defense of usury as to the element of the RICO claim that LG Capital was collecting a usurious note.  Absent the conversion feature being considered interest, there was no basis to believe that the Notes were usurious.  *See* Dkt. No. 68 at 6; *LG Cap. Funding*, 2018 WL 6547160, at \*5 (granting summary judgment after rejecting affirmative defenses that the Notes were unlawfully usurious, because the floating-price convertible option was "too uncertain to incorporate into an interest rate calculation").  There is no reason then why the LG Managers should have known or believed that they would have been named but for a mistake based on an error of law.  The same view regarding the interest rate calculation would apply to a RICO claim as to the affirmative defense.  From the information conveyed by the Answer, the only conclusion the LG Managers could have reached was that the decision to assert usury as an affirmative defense but not to make it an affirmative claim was the function of ELED's "deliberate choice" as to what claims to make and what not.  *Krupski*, 560 U.S. at 549.  In short, the LG Managers had good reason to believe that ELED's decision not to

bring a counterclaim under RICO for collection of an unlawful debt reflected a strategic or legal judgment, rather than omission made only because of an error of law.

Moreover, even leaving aside that the LG Managers could have understood the Answer itself to reflect a considered choice (not a mistake) as to what allegations to make and against whom, the mistake ELED seeks to rely upon does not speak to the identity of the parties within the meaning of Rule 15(c) such that the individual Counterclaim-Defendants should have known that absent the mistake, the claim would have been brought against them. "A mistake *about a party's identity* in the context of Rule 15(c) can be either (1) a factual mistake, such that a party 'misapprehended the identit[y]' of a party to be added; or (2) a legal mistake, such that a party 'misunderstood the legal requirements of her cause of action.'" *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 2010 WL 3239430, at *9 (S.D.N.Y. Aug. 17, 2010) (quoting *Soto v. Brooklyn Corr. Facility*, 80 F.3d 34, 35 (2d Cir. 1996) (emphasis added)). ELED's asserted mistake was neither. It was not a factual mistake. The LG Managers were signatories to the agreements alleged in the original complaint filed in this action in May 2017. *See* Dkt. No. 1-1 at 12 (naming Lerman). There were not, for example, other individuals referenced in the Answer such that the LG Managers could have realized that ELED intended to reference them. ELED now alleges that the LG Managers, individually or collectively, negotiated for and obtained the floating-price conversion rights set forth in the Notes. Dkt. No. 140 ¶ 28. There would have been no reason for them to suspect that but for ELED's mistake regarding their identity they would have been named as Counterclaim-Defendants in 2017 for a RICO violation.

ELED also has not identified a legal mistake, such as that it misunderstood the legal requirements of its cause of action, *Pass-Through Certificates Litig.*, 2010 WL 3239430, at *9, that would have put the LG Managers on notice that they would be sued for violating RICO.

ELED did not assert a RICO counterclaim within the requisite Rule 4(m) time period.  The "mistake" ELED seeks to rely upon is not one regarding the elements of its cause of action, or at least not one that the LG Managers would have understood to be one regarding the elements of its cause of action.  There was nothing that prohibited ELED from filing a RICO claim in 2017.  While some district court judges might have disagreed with the allegation regarding usury that would have formed the basis for that claim, the issue itself was still open and, in any event, Rule 11 permits a party to make even an argument she believes to be a loser so long as it is "a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law."  Fed. R. Civ. P. 11(b)(2).  The decision not to assert a RICO claim would have appeared to the LG Managers to be, as it appears to have actually been, the function of a considered judgment as to what to allege and what not to allege.  The fact that the New York Court of Appeals later made it easier for ELED to allege that the interest rate charged was usurious, and thereby to assert a RICO claim based on usury, therefore does not relieve ELED of the consequences of its decision not to sue the LG Managers earlier (within the limitation period) or permit it to use the vehicle of relation-back to sue the LG Managers now for a claim it could have asserted earlier.  The LG Managers would not have known that but for a mistake regarding identity they would have been named earlier.

The Second Circuit's decision in *Soto v. Brooklyn Correctional Facility* is thus of no assistance to ELED.  In that case, the Second Circuit held that a civil rights suit filed by a *pro se* litigant against an institutional defendant, which was not subject to suit based on the *pro se* litigant's allegations, could be amended to add the individual corrections officers who would have been liable for the violation of the plaintiff's rights, but who were not named as a result of a mistake.  *Soto*, 80 F.3d at 34, 37.  The court held that the plaintiff's failure to name the

individuals could not "be considered a matter of choice." *Id.* at 37.  The plaintiff there had

timely filed a complaint alleging constitutional torts, the complaint "clearly" did not allege a

custom or policy necessary to impose municipal liability, and the government officials ("charged

with knowing the law") would or should have known that they—and not the governmental

defendant—were liable for the torts alleged.  *Id.* at 36.  Under those circumstances, the Circuit

held that but for the plaintiff's "mistake as to the technicalities of constitutional tort law, he

would have named the officers in the original complaint, within the three-year limitations

period." *Id.* at 37.[6]

Those circumstances are not present here.  Not only did ELED not assert a RICO

counterclaim in its Answer, but even if it had, there would be no reason for the LG Managers to

suspect that but for a mistake as to identity, they would have been named in such RICO

counterclaim.  ELED would not have been required then, and is not required now, to name the

LG Managers as defendants.  *Cf. Cornwell v. Robinson*, 23 F.3d 694, 705 (2d Cir. 1994)

("Cornwell was not required to sue [the individual defendants], and her failure to do so in the

original complaint . . . must be considered a matter of choice, not mistake.").  The counterclaims

against the LG Managers thus do not relate back to the Answer, and are dismissed as untimely.

*Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*, 624 F. App'x 23, 28 (2d Cir. 2015)

(summary order) ("Accordingly, because the new defendants could not have known that they

were the proper defendants in the initial state court action but for a mistake, [the plaintiff's] later

RICO claims do not relate back to its initial state court complaint, and are untimely.").[7]

---

[6] The *Soto* court also emphasized that the case presented an "unusual situation" with a *pro se* plaintiff and governmental litigants.  80 F.3d at 34.

[7] ELED, quoting *Krupski*, goes so far as to suggest that "relation back [is] 'mandated' under these circumstances."  Dkt. No. 184 at 8 (quoting *Krupski*, 560 U.S. at 553).  But *Krupski* stands only for the proposition that Rule 15(c) "mandates relation back once the Rule's requirements

**B.      Failure to State a Claim Upon Which Relief Can Be Granted**

Counterclaim-Defendants argue that the Counterclaim Complaint fails to state a claim for a RICO violation on the alternative bases that it fails to allege an unlawful debt and that it fails to allege a RICO injury.  Dkt. No. 178 at 9–20.

Section 1962(c) of Title 18 makes it unlawful to conduct or participate in the conduct of the affairs of an enterprise through the "collection of unlawful debt."  18 U.S.C. § 1962(c).  An "unlawful debt" is defined by RICO to include a debt "which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury," and "which was incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State or Federal Law, where the usurious rate is at least twice the enforceable rate."  *Id.* § 1961(6).  "In order to state a RICO claim based on the collection of an unlawful debt, a plaintiff must allege that (1) 'the debt was unenforceable in whole or in part because of state or federal laws relating to usury,' (2) 'the debt was incurred in connection with "the business of lending money . . . at a [usurious] rate,"' and (3) 'the usurious rate was at least twice the enforceable rate.'"  *Dae Hyuk Kwon v. Santander Consumer USA*, 742 F. App'x 537, 539 (2d Cir. 2018) (summary order) (alteration in original) (quoting *Durante Bros. & Sons v. Flushing Nat'l Bank*, 755 F.2d 239, 248 (2d Cir. 1985)).  "The first part of § 1961(6) requires that 'unlawful debt' either (1) be incurred or contracted in some form of illegal gambling activity or (2) be unenforceable by virtue of state or federal usury laws.  The second part—subsection (B)—further narrows the definition, requiring, *inter alia*, that the 'unlawful debt' be incurred in connection with an illegal 'business.'"  *United States v. Persico*, 2011 WL 2433728, at *2

---

are satisfied," and does not "leave that decision to the district court's equitable discretion."  560 U.S. at 553.  Here, the Court does not find that Rule 15(c)'s requirements are satisfied with respect to the LG Managers, and then exercise equitable discretion to deny relation back as to those Defendants.  Instead, the Court finds that Rule 15(c)'s requirements are not satisfied.

(E.D.N.Y. June 14, 2011).  "RICO offenses may be predicated on a single instance of collection of unlawful debt . . . ."  *United States v. Grote*, 961 F.3d 105, 119 (2d Cir. 2020).[8]

Counterclaim-Defendants argue that ELED has failed to allege that the debt they attempted to collect was unlawful.  The Counterclaim Complaint alleges that Counterclaim-Defendants attempted to collect on two loans to ELED—the Notes—both styled as convertible loans.  Dkt. No. 140 ¶ 19.  As previously noted *supra*, in August 19, 2015 LG Capital loaned ELED, through Note 1, $58,937.26 subject to a stated interest rate of eight percent per annum and a ten percent original issue discount, causing the net amount to be funded to be equal to $54,396.14.  *Id.* ¶ 20.  Note 1 permitted LG Capital to, at its option, convert all or any amount of the debt owed under it into newly issued shares of ELED at a price per share equal to sixty-five percent of the lowest closing price during the fifteen days prior to the conversion request.  *Id.* ¶ 21.  Note 2, also executed on August 19, 2015, memorialized that LG Capital had acquired three separate loans made to ELED totaling $129,500—then owing to a company named KBM Worldwide, Inc.—under which ELED was obligated to repay $129,746.30 plus interest accruing at a rate of eight percent per annum, and which granted the holder of the right to, at its option, convert all or any amount of the loan into newly-issued shares of ELED common stock at a price per share equal to fifty-eight percent of the lowest closing price during the fifteen trading days

---

[8] The Second Circuit has not decided "the precise parameters of 'the business' of usury as intended by Congress," *Durante*, 755 F.2d at 250, and courts in this District are divided whether the statute would extend to the "occasional usurious transactions by one not in the business of loan sharking," *id.*; *compare Wade Park Land Holdings, LLC v. Kalikow*, 589 F. Supp. 3d 335, 376 (S.D.N.Y. 2022) (applying *Durante* dictum), *amended*, 2022 WL 2479110 (S.D.N.Y. July 6, 2022), *with DarkPulse, Inc. v. EMA Fin., LLC*, 2023 WL 2307386, at *5 (S.D.N.Y. Mar. 1, 2023) (rejecting argument that complaint should be dismissed because it alleged only occasional usurious transactions).  Counterclaim-Defendants' motion provides no occasion for the Court to consider whether LG Capital's conduct, as alleged in the Counterclaim-Complaint, falls within the bounds of the business of usury as intended by Congress.

prior to the conversion request.  *Id.* ¶¶ 30–31.

The Counterclaim Complaint calculates the effective interest rate as a function of the value of the conversion option acquired by LG Capital in exchange for the loan.  ELED alleges that "[t]he floating-price conversion right LG [Capital] reserved itself in Note 1 is an additional source of interest" to LG Capital and that, "Note 1 provides LG [Capital] with a floating-conversion discount of 35%, which causes Note 1 to charge an additional 54% interest."  *Id.* ¶¶ 24–25.  ELED further alleges that, "Note 2 provides LG Capital with a floating-conversion discount of 42%, which causes Note [2] to charge an additional 72.4% interest."  *Id.* ¶ 35.

Counterclaim-Defendants' challenge the sufficiency of ELED's pleading that the debt sought to be collected was unlawful on two separate grounds: (1) contrary to the allegations of the counterclaim, Delaware law and not New York law applies to the Notes and under Delaware law the interest rate would not be usurious, Dkt. No. 178 at 12–15; and (2) the counterclaim does not adequately allege a usurious interest rate under New York law, *id.* at 15–20.  Counterclaim Defendants also argue that, if the Notes charged an unlawful rate of interest under New York law, they would have been unenforceable and thus ELED has not stated a claim for RICO injury.  The Court considers each argument in turn.

### 1.    Adequacy of Pleading That New York Law is Applicable

The counterclaims allege that the Notes and the Redemption Agreement are governed by the laws of the State of New York, Dkt. No. 140 ¶¶ 23, 33, 40, and that a substantial majority, if not all, of LG Capital's loans are governed by New York law, *id.* ¶ 15.  On that basis, ELED alleges that the Notes are criminally usurious.  *Id.* ¶¶ 24, 34, 76, 78-79.

Counterclaim-Defendants challenge the adequacy of ELED's pleading that New York law applies, and argue that Delaware law applies to the Notes and the Redemption Agreement.  Dkt. No. 178 at 12–15.  Recognizing that each of the agreements contains a New York choice-

of-law provision, Counterclaim Defendants argue that the Court should disregard ELED's

pleading and disregard the parties' choice of New York law, because those provisions would

make the conversion feature unenforceable.  It argues that Delaware law instead applies to the

Notes, and that under Delaware law, loans in excess of $100,000 cannot be usurious.  *Id.*

Counterclaim-Defendants point to the New York choice-of-law principle that where the parties

to a contract "choose a law that would declare the contract invalid . . . the chosen law will not be

applied by reason of the parties' choice."  *See* Restatement (Second) Conflict of Laws § 187 cmt.

e.  In such circumstances, because "parties can be assumed to have intended that the provisions

of the contract would be binding upon them," applying a choice-of-law provision that would

render the contract invalid "would defeat the expectations of the parties which it is the purpose of

the present rule to protect."  *Id.*  Counterclaim-Defendants assert that if under New York law the

interest rate on the Notes is calculated such that the rate charged was usurious and the Notes are

unenforceable, then Delaware law would apply and the interest rate charged would not be

usurious, defeating ELED's RICO claim.  Dkt. No. 178 at 13.

Counterclaim-Defendants' argument does not provide a basis to dismiss the

counterclaim.  On a motion to dismiss, the Court must take the well-pleaded allegations as true.

*Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 678–79.  Although the Court may refer to the

contents of documents incorporated by reference where those documents are integral to the

complaint, *Goel v. Bunge, Ltd.*, 820 F.3d 554, 558–59 (2d Cir. 2016); *Lateral Recovery, LLC v.

Cap. Merch. Servs., LLC*, 632 F. Supp. 3d 402, 435 (S.D.N.Y. 2022), the motion to dismiss may

be granted only if Counterclaim-Defendants' claim that New York law is applicable is not

plausible, *see, e.g.*, *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d

Cir. 2006); *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011).  The contents of the documents

do not contradict ELED's allegations and those allegations plausibly establish that New York law applies to the Notes and the Redemption Agreement.

The parties all proceed as though New York choice-of-law rules determine the law to be applied to the Notes and the Redemption Agreement.[9]  *See Woodling v. Garrett Corp.*, 813 F.2d 543, 551 (2d Cir. 1987) (the court, in a diversity action, "look[s] to the choice-of-law rules of New York to determine whether and to what extent the parties' contractual choice should be honored").  Each Note contains a choice-of-law provision that states, "[t]his Note shall be governed by and construed in accordance with the laws of New York . . . ."  Dkt. No. 140-1 § 14; Dkt. No. 140-2 § 14.  The Redemption Agreement also contains a New York choice-of-law provision.  Dkt. No. 140-5 § 3(a).  "[T]he validity of a contractual choice-of-law provision is 'decided not under the law specified in the clause, but under the relevant forum's choice-of-law rules governing the effectiveness of such clauses.'"  *Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, 2022 WL 1997207, at *14 (S.D.N.Y. June 6, 2022) (quoting *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 332, 335 (2d Cir. 2005)).  "Under New York law, great deference is to be given a contract's designation of the law that is to govern disputes arising from the contract, and that designation is determinative if the state selected has sufficient contacts with the transaction."  *Zerman v. Ball*, 735 F.2d 15, 20 (2d Cir. 1984); *see also Int'l*

---

[9] Both parties operate as though the choice-of-law principles of New York apply to the question whether New York or Delaware law governs the Notes.  *See* Dkt. No. 178 at 12–15; Dkt. No. 184 at 19–22.  The Court therefore proceeds on that understanding.  *Cf. Pacific Indem. Co. v. Kiton Corp.*, 2022 WL 4237092, at *2 (S.D.N.Y. Sept. 14, 2022) ("A court may presume that the parties consent to the application of the form state's choice of law when no party raises choice of law.").  The Court notes, however, that there is some question as to whether New York choice-of-law principles should apply where, as here, the lender and not the borrower is located in New York.  *Cf. United States v. Moseley*, 980 F.3d 9, 20 (2d Cir. 2020) ("Moseley agrees with the government that, as to New York borrowers, New York law governs the question whether the agreements' choice-of-law provision was effective.").

*Bus. Machs. Corp. v. Mueller*, 2017 WL 4326114, at *4 (S.D.N.Y. Sept. 27, 2017) (same).  If a claim falls within a contract's choice-of-law provision and the provision calls for application of a certain state's law, that law will generally be applied "so long as the chosen law bears a reasonable relationship to the parties or the transaction," but it will not be applied "where the chosen law 'violates some fundamental principles of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal.'"  *Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 859 N.E.2d 498, 500–01 (N.Y. 2006); *see also United States v. Moseley*, 980 F.3d at 20 ("New York law is unambiguous in the area of express choice-of-law provisions in a contract. Absent fraud or violation of public policy, contractual selection of governing law is generally determinative so long as the State selected has sufficient contacts with the transaction." (quoting *Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 592 (2d Cir. 1996))); *Medtronic, Inc. v. Walland*, 2021 WL 4131657, at *4–6 (S.D.N.Y. Sept. 10, 2021) (explaining that, even after the New York Court of Appeals's decision in *Ministers & Missionaries Benefit Board v. Snow*, 45 N.E.3d 917 (N.Y. 2015)—which stated that "New York courts should not engage in any conflicts analysis where the parties include a choice-of-law provision in their contract"—a court should consider whether a choice-of-law provision bears a reasonable relationship to the parties or transaction or violates a fundamental policy of a state with a materially greater interest than the chosen state).  New York law does not follow the rule of validation applied in some other states to usury cases, pursuant to which the court will apply the law of any state connected to a transaction that will validate the transaction, in order to give effect to the parties' apparent intention to enter into a lawful contract.  *Moseley*, 980 F.2d at 23 (citing *A. Conner Gen. Contracting Inc. v. Rols Cap. Co.*, 535 N.Y.S.2d 420 (2d Dep't 1988)); *see Fleetwood*, 2022 WL 1997207, at *17.  In addition, "New York judicial opinions have consistently recognized the

state's prohibition of excessive interest rates as embodying a fundamental public policy."
*Moseley*, 980 F.2d at 21.

Counterclaim-Defendants' argument is predicated on the notion that a New York court
must, when confronted with the question of whether to give effect to a New York choice-of-law
provision that would render a loan usurious and unenforceable, disregard the choice-of-law
provision in order to preserve the parties' decision to enter into a binding contract.  But a New
York court might also choose to give effect to the choice-of-law provision in order to respect
New York's stated policy interest in protecting those that avail themselves of New York law
from usurious loans.  The Court need not now decide that question of law as to which the parties
cite no authority because, even if the Court were to disregard the choice-of-law provisions in the
Notes, ELED has alleged sufficient facts that New York law would apply to the Notes so as to
make its counterclaim plausible, and to permit it to go forward to discovery.

In the absence of a choice-of-law provision, New York applies a "center of gravity"
approach to contract cases.  *Moseley*, 980 F.3d at 23.  The center of gravity approach focuses on
the place with "the most significant contacts with the matter in dispute," looking to "five
generally significant contacts: the places of contracting, negotiation and performance; the
location of the subject matter of the contract; and the domicile of the contracting parties."  *Id.*
(internal quotation marks and citations omitted) (alterations adopted) (analyzing which state's
usury laws would apply under "center of gravity" approach); *see also A. Conner Gen.
Contracting Inc.*, 535 N.Y.S.2d at 421.  "The traditional choice of law factors—the places of
contracting and performance—are given heavy weight in this analysis."  *Tri-State Emp. Servs.,
Inc. v. Mountbatten Sur. Co.*, 295 F.3d 256, 261 (2d Cir. 2002).  In this approach, "public policy
considerations . . . may also bear on the analysis in cases 'where the policies underlying

conflicting laws in a contract dispute . . . reflect strong governmental interests.'" *Moseley*, 980

F.3d at 23 (quoting *In re Allstate Ins. Co. (Stolarz)*, 613 N.E.2d 936 (N.Y. 1993)).

Even if the Court were to disregard the choice-of-law provision contained in the Notes,

which specify that they are governed by New York law, ELED has alleged sufficient facts that

New York law applies to the instant action to make its claim plausible. *See* Restatement

(Second) Conflict of Laws § 187 cmt. e ("If, however, the chosen law is that of the state of the

otherwise applicable law under the rule [governing in absence of effective choice by the parties],

this law will be applied even when it invalidates the contract.  Such application will be by reason

of the rule [governing in absence of effective choice by the parties], and not by reason of the fact

that this was the law chosen by the parties.").  The Counterclaim Complaint plausibly alleges

that the center of gravity of the transactions at issue was New York.  It alleges that LG Capital is

a New York limited liability company with a principal place of business in New York.  Dkt. No.

140 ¶ 3.  It alleges that LG Capital "negotiates the usurious loan from New York, memorializes

the usurious loans in New York, lends money from its bank accounts situated in New York, and

subsequently decides when to collect the usurious debt via conversions from New York." *Id.*

¶ 81.  ELED has thus plausibly alleged that the center of gravity of the transactions at issue is

New York, and therefore that—even if the choice-of-law provision is unenforceable—New York

law applies to the instant action.

## 2.    Interest Rate Calculation

Counterclaim-Defendants' next argue that ELED's allegations are based on an erroneous

method of calculating the interest rate charged on the Notes, and that the allegations therefore

fail to support a claim that the Notes charged interest at a rate that would be usurious under New

York law.  The argument is without merit.  "[I]n assessing whether the interest on a given loan

has exceeded the statutory usury cap, the value of the floating-price convertible options [is]

included in the determination of interest." *Adar Bays*, 179 N.E.3d at 621; *see EMA Fin., LLC v. Chancis*, 80 F.4th 395, 405 (2d Cir. 2023) ("Should the district court determine that the value of the floating-price conversion options, when measured at the time of contracting, causes the interest rates on the Notes to exceed 25%, we respectfully instruct the district court to find the Notes void and unenforceable . . . ."); *DarkPulse*, 2023 WL 2307386, at *5; *Golock Cap., LLC v. VNUE, Inc.*, 2023 WL 3750333, at *6 (S.D.N.Y. June 1, 2023).  In determining whether the floating-price convertible option causes the interest rates on the Notes to exceed twice the statutory maximum, "the value of such an option is a question of fact." *Adar Bays*, 179 N.E.3d at 621.  Specifically, "the valuation of a contingent future payment must be tailored to the risks involved in a particular investment . . . ." *Id.* at 624.  At the motion to dismiss stage, then, it is sufficient that ELED plausibly allege facts to support the conclusion that the Notes, factoring in the value of the floating-price conversion option, charged an interest rate greater than fifty percent.

The Counterclaim Complaint alleges sufficient facts that would support such a conclusion.  Although "the mere fact that a fixed-price future conversion option may be exercised at a future usurious rate does not render the loan usurious on its face," *Adar Bays*, 179 N.E.3d at 624, ELED here alleges much more than just that Note 1 and Note 2 have a floating-rate option.  The Counterclaim Complaint does not merely allege the amounts that LG Capital collected on the loans—$301,681.58 or $117,785.44 worth of consideration in excess of what was loaned to ELED.  Dkt. No. 140 ¶¶ 49–50.  Instead, the Counterclaim Complaint plausibly alleges "the prior performance of similarly structured floating price convertible loans made by [the] lender," *Adar Bays*, 179 N.E.3d at 626, and that such performance resulted in recovery that could plausibly be found to be usurious, Dkt. No. 140 ¶ 60–63.  It further alleges LG Capital's

general business model was to make usurious loans. *Id.* ¶¶ 14–17, 56–57. ELED has alleged

sufficient facts to make its claim plausible. *See DarkPulse,* 2023 WL 2307386, at *5.

        **3.**       **Enforceability of the Notes**

Finally, Counterclaim-Defendants argue that even if New York law applies, ELED has

not alleged an injury to business or property, as required to bring a RICO claim, because under

the law of New York a contract with a usurious interest rate is void. Dkt. No. 178 at 15–20; *see*

*Adar Bays,* 179 N.E.3d at 616 ("The text, history, and purpose of New York's usury laws

demonstrate that, if the borrower establishes the defense of usury in a civil action, the usurious

loan transaction is deemed void and unenforceable, resulting in the uncollectability of both

principal and interest."). Counterclaim-Defendants point to New York law that accordingly,

"General Obligations Law § 5-521 bars a corporation from asserting usury in any action, except

in the case of criminal usury as defined in Penal Law § 190.40, and then only as a defense to an

action to recover payment of a loan, and not as the basis for a cause of action asserted by the

corporation for affirmative relief." *Paycation Travel v. Glob. Merch. Cash, Inc.*, 141 N.Y.S.3d

319, 320 (2d Dep't 2021); *see also Collins v. MCA Receivables, LLC*, 2024 WL 246111, *4

(S.D.N.Y. Jan. 23, 2024) ("New York courts have uniformly construed [the state usury] statute

as limited to the affirmative defense, and they have prohibited corporations from bringing

affirmative claims or counterclaims alleging criminal usury and seeking to invalidate an

agreement." (quoting *Streamlined Consultants, Inc. v. EBF Holdings LLC*, 2022 WL 4368114, at

*3 (S.D.N.Y. Sept. 20, 2022))). Counterclaim Defendants argue that because New York law

does not afford a remedy for an injury to business or property due to collection of a usurious

debt, and instead treats such transactions as void *ab initio*, New York law cannot serve as the

basis for a RICO claim alleging that a debt collection was unlawful. Dkt. No. 178 at 17.

That argument proves too much.  The Court first notes that a court in this District has held that New York law can provide the foundation for claims brough under RICO, even if an affirmative cause of action for usury could not be sustained under New York law.  *See Haymount Urgent Care PC v. GoFund Advance, LLC*, 635 F. Supp. 3d 238, 243 (S.D.N.Y. 2022) ("Congress has chosen to provide a federal cause of action that amplifies certain state-law rights by allowing plaintiffs to bring RICO claims against enterprises engaged in the collection of debts rendered unlawful by state law.  18 U.S.C. § 1962(c).  Plaintiffs sue under that federal cause of action, not under New York's usury laws.").  This Court agrees; RICO makes it unlawful to collect an unlawful debt, including a debt that is: "unenforceable by virtue of state or federal usury laws."  18 U.S.C. §§ 1961(6), 1963(c).  Under New York Penal Law, a loan is criminally usurious if it charges an interest rate "exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period."  N.Y. Penal Law § 190.40.  It is not a defense to a RICO civil claim that the debt is unenforceable.  The very evil against which RICO is directed is the effort to collect a debt that is unenforceable.  It therefore follows that the fact that ELED could have (and did) assert as a defense to a collection action that the debt it incurred to LG Capital was unenforceable, does not relieve Counterclaim-Defendants of liability if, in fact, ELED suffered injury as a result of LG Capital's creation and/or receipt of unlawful interest.  *See Haymount*, 635 F. Supp. 3d at 243 ("It is now defendants who are seeking to enforce the MCA agreements in part with respect to their class waiver provisions.  And against that affirmative attempt to enforce these agreements, plaintiffs have 'interpose[d] the defense of criminal usury,' contending that the MCA agreements are and have always been void and that therefore the class-action waiver provisions in them cannot be enforced.").

As previously noted, "to prove that what was collected was an unlawful debt within the meaning of RICO, [a plaintiff] would have to show that [1] the debt was unenforceable in whole or in part because of state or federal laws relating to usury, [2] the debt was incurred in connection with 'the business of lending money . . . at a [usurious] rate,' and [3] the usurious rate was at least twice the enforceable rate." *Durante Bros.*, 755 F.2d at 248. The Counterclaim Complaint alleges that Counterclaim-Defendants have engaged in the illegal collection of debt by charging on the Notes more than double the lawful maximum rate of interest permitted by New York's usury laws as part of their business of lending at a usurious rate. Dkt. No. 140 ¶¶ 16, 79. Specifically, ELED alleges that Note 1 charged at least fifty-four percent, *id.* ¶ 26, and that Note 2 charged at least seventy-two percent, *id.* ¶ 36, each more than double the enforceable maximum of twenty-five percent under New York law. ELED has thus sufficiently pleaded the first and third prongs of the "unlawful debt" test. With respect to the second prong of the "unlawful debt" test, ELED alleges, and Counterclaim Defendants do not dispute, that the Notes were executed and collected in connection with the business of lending money at a usurious rate, highlighting publicly available information about other convertible notes entered into by LG Capital. *Id.* ¶¶ 54–64.

ELED alleges that it was injured because it was forced to pay interest in the form of valuable shares of ELED common stock at a rate in excess of that permitted by New York law. *Id.* ¶ 85. "Victims of racketeering who have been deprived of their monetary resources as a direct result of racketeers' predicate acts should, under the most natural interpretation of the phrase 'business or property,' recover their pecuniary losses." *Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.*, 74 F. Supp. 2d 221, 229 (E.D.N.Y. 1999). The Second Circuit has clarified that RICO damages should be "sufficient to place the plaintiff in the same financial

position [it] would have occupied absent the illegal conduct." *Bankers Tr. Co.*, 859 F.2d at 1106. Counterclaim Defendants do not dispute that they collected $316,618.58 of consideration from ELED, as asserted in the Counterclaim Complaint. Dkt. No. 140 ¶ 53. ELED has therefore alleged facts to show that it was deprived of its monetary resources as a result of Counterclaim Defendants' usurious lending practices, and was thereby injured in its business or property as a result of Counterclaim-Defendants' RICO violations. Dkt. No. 140 ¶¶ 84–89. These allegations are enough for the claim to proceed at this stage.

## CONCLUSION

The motion for relief from the Court's prior Order granting ELED leave to submit the Counterclaim Complaint is DENIED, and the motion to dismiss the Counterclaim Complaint is GRANTED IN PART and DENIED IN PART.

The Clerk of Court is respectfully directed to close Dkt. No. 176.

SO ORDERED.

Dated: March 13, 2024
       New York, New York                        _____
                                                        LEWIS J. LIMAN
                                                  United States District Judge